UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 10-10695-RGS

CESAR MATOS

v.

MICHAEL J. ASTRUE, COMMISSIONER
SOCIAL SECURITY ADMINISTRATION

MEMORANDUM AND ORDER ON
APPELLANT'S MOTION TO REVERSE
AND APPELLEE'S MOTION TO AFFIRM
THE DECISION OF THE COMMISSIONER

July 7, 2011

STEARNS, D.J.

Appellant Cesar Matos seeks review of the final decision of the Commissioner of the Social Security Administration adopting an Administrative Law Judge's (ALJ) determination that Matos is not disabled as defined by the implementing regulations of the Social Security Act (SSA). *See* 20 CFR § 404.1520(g). The issues on appeal are whether substantial evidence supports the ALJ's findings: (1) that Matos' depression was not severe; (2) that Matos' subjective complaints of pain were not credible; and (3) that Matos' non-exertional limitations do not preclude him from working in a number of jobs available in the national economy. Matos timely filed this appeal pursuant to 42 U.S.C. § 405(g), seeking a reversal or remand of the ALJ's decision.

The Commissioner has cross-moved for an affirmation. The court heard oral argument on June 30, 2011.

## BACKGROUND

Matos applied for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) on July 5, 2006. The application was denied by the SSA on September 9, 2006, and again after reconsideration on February 14, 2007. Matos requested a hearing before an ALJ on February 28, 2007. On January 23, 2008, ALJ Francis C. Newton, Jr., heard testimony from Matos with the aid of an interpreter. The ALJ issued his decision, unfavorable to Matos, on October 23, 2008.

The ALJ found that Matos suffered from severe impairments – a rotator cuff tear, diabetes mellitus, high blood pressure, and lipoma – but that Matos nonetheless retained the residual functional capacity (RFC) to perform a range of available light jobs. After the Decision Review Board denied Matos' request for review on February 25, 2010, the ALJ's decision became the final decision of the Commissioner.

Matos was born on March 13, 1960. On the alleged disability onset date – February 1, 2006 – Matos was forty-five years old. Although he cannot speak English, Matos can read and write in Spanish and perform simple mathematics. From 1994 to 2006, Matos worked as an assembler, delivery driver, maintenance person, packer, helper in an auto repair shop, food market worker, and storage facility worker. He has

not worked since.

On May 15, 2006, Matos presented to the emergency room at Boston Medical Center complaining of pain in his right arm and shoulder. Matos reported that the pain had begun approximately three months prior to his visit, while he was attempting to push a heavy object. He stated that the pain – presumably intermittent at its onset – had persisted for the previous three weeks. An examination of Matos' shoulder revealed some tenderness in the glenohumeral joint[1], but no deformity, erythema[2], warmth, or muscle atrophy. Matos' distal motor and sensory nerves were intact, as were his distal pulses.[3] On his left posterior back, however, a small cyst was observed. Matos was prescribed ibuprofen and discharged.

A month later, Matos had his shoulder evaluated by Jeremiah Frank, M.D., who took a more detailed history of Matos' shoulder problems. Matos reported that his shoulder pain dated back to 1992, when he attempted to lift a ninety-pound box while at work. Matos stated that he had exacerbated the injury while working on a car two

---

[1] The glenohumeral joint – or shoulder joint – links the glenoid cavity of the scapula (shoulder blade) to the head of the humerus (upper arm bone). *See Stedman's Medical Dictionary* 724, 811 (26th ed. 1995).

[2] An erythema is defined as "redness of the skin due to capillary dilatation." *Id*. at 594.

[3] Distal nerves and pulses are simply those "situated away from the center of the body, or from the point of origin; specifically applied to the extremity or distant part of a limb or organ." *Id*. at 511.

months prior to seeing Dr. Frank – just as he was pulling on a wrench, Matos had felt a sudden pop in his shoulder. Dr. Frank observed tenderness in Matos' coracoclavicular tendon[4] and pain with cross-body abduction[5], but no deformities in his shoulder. Matos' internal rotation was only mildly decreased, but his external rotation was markedly decreased. Provocative testing of the supraspinatous muscle[6] and external rotators prompted pain and weakness. Matos was consequently diagnosed with a rotator cuff injury, as well as a lipoma. An MRI revealed a partial width bursal surface tear[7] of the supraspinatous tendon.[8] Dr. Frank prescribed pain medication.

On October 20, 2006, Andrew Glantz, M.D., surgically removed the subcutaneous lipoma[9] on Matos' left upper back. Ten days later, at a follow-up appointment, Matos reported no pain or discomfort. After noting that the incision had

---

[4] The coracoclavicular tendon connects the scapula (shoulder blade) to the clavicle. *Id*. at 393.

[5] An abduction is a "movement of a body part away from the median plane of the body." *Id*. at 2.

[6] The supraspinatous muscle refers to the muscle that is located above the spine of the shoulder blade. *Id*. at 681, 1152, 1708.

[7] A bursa is a "closed sac or envelope lined with synovial membrane and containing fluid, usually found or formed in areas subject to friction: e.g., over an exposed or prominent part or where a tendon passes over a bone." *Id*. at 252.

[8] The supraspinatous tendon is located above the spine of the shoulder blade. *Id*. at 681, 1152, 1708.

[9] A subcutaneous lipoma is one that forms beneath the skin. *Id*. at 424.

healed, Dr. Glantz removed the stitches and told Matos that he needed no further treatment.

In March of 2007, Matos returned to Dr. Glantz complaining of intermittent pain at the surgical site. On examination, Dr. Glantz observed that the wound was well-healed. In aspirating the incision, Dr. Glantz saw that there was no sign of fluids or infection. There was, however, a bulge at the operative site. Dr. Glantz detected a palpable muscle spasm, and told Matos to continue to take pain medication. Matos returned two months later for a follow-up appointment, complaining of recurrent swelling at the surgical site. The examining physician, Neeraj Rastogi, M.D., observed a 4x4 centimeter swollen area at the site, but noted that it was "probably secondary to [the] recurrent lipoma."[10] Matos denied any pain, fever, or increased swelling. He was told to return only as needed.

In November of 2007, Matos presented to Dr. Glantz with complaints of increases in the size of, and pain associated with, the lipoma. Dr. Glantz noted a palpable mass in Matos' left posterior back that was tender to palpation. Dr. Glantz attempted to aspirate the mass, but no fluid emerged. An ultrasound confirmed the presence of a lobular mass suggestive of lipoma. Dr. Glantz removed the recurrent

---

[10] Dr. Rastogi also observed that Matos' right and left upper extremities demonstrated a normal range of motion and strength without any joint enlargement or tenderness.

lipoma from Matos' upper back on January 4, 2008. Ten days later, Matos' sutures were removed after the incision was observed to be healing well.

Twelve days later, on January 16, 2008, Matos presented to an orthopedic surgeon, Anthony Schepsis, M.D., complaining of back pain. Dr. Schepsis prescribed physical therapy and gave Matos a referral for a cortisone injection. Matos returned the following month reporting that he had followed neither recommendation. Dr. Schepsis repeated his instructions.

Despite complying this time with Dr. Schepsis' advice, Matos continued to feel pain in his right shoulder. An examination in September of 2008 showed that Matos had a full range of motion in his neck as well as his right shoulder. On forward flexion and abduction, however, Matos felt pain. Dr. Glantz prescribed medication and diagnosed Matos with right cervical radiculopathy[11] and right rotator cuff syndrome.

Approximately one month later, Matos was examined by Douglas Comeau, D.O., for pain in his neck and shoulder. Again, Matos demonstrated a full range of motion and strength in his right shoulder. However, Matos complained of pain on forward flexion and abduction. Matos' neck also exhibited a full range of motion and

---

[11] Radiculopathy is a "disorder of the spinal nerve roots." *Stedman's Medical Dictionary* 1484 (26th ed. 1995).

strength, with decreased trapezius muscle spasm.[12] An MRI of Matos' cervical spine revealed mild disc osteophyte complex[13] at C3-C4, C4-C5, and C6-C7.[15] A mild left neural foraminal[16] narrowing was observed at C2-C3, C3-C4, C4-C5, and C6-C7. Dr. Comeau also noted a disc osteophyte complex with facet hypertrophy[17] (left greater than right) at C5-C6, a moderate neural foraminal narrowing on Matos' left, along with a moderate to severe neural foraminal narrowing. Dr. Comeau referred Matos for an epidural steroid injection[18] and prescribed pain medication.

THE MEDICAL REVIEW

On September 15, 2006, a Massachusetts Rehabilitation Commission (MRC)

---

[12] The trapezius muscle extends from below the skull, vertically to the lower vertebrae, and laterally to the shoulder blade. *Id.* at 1159, 1842.

[13] An osteophyte refers to "a bony outgrowth or protuberance." *Id.* at 1270.

[15] The vertebra constitutes "one of the segments of the spinal column," *Id.*, at 1931, and usually consists of "33 vertebrae, 7 cervical, 12 thoracic, 5 lumbar, 5 sacral. . .and 4 coccygeal. . . ." *Id.* The spine is made up of 24 discs, which are identified in reference to the vertebrae they separate. The disc between the fourth and fifth cervical vertebrae, for example, is designated "C4-C5."

[16] The foramina is "an aperture or perforation through a bone or a membranous structure." *Id.* at 674.

[17] Hypertrophy refers to the "general increase in bulk of a part or organ, not due to tumor formation." *Id.* at 832.

[18] A procedure by which steroids are injected into the epidural space – that is, "upon or outside the dura matter." *Id.* at 583. The dura matter, in turn, refers to the "tough, fibrous membrane forming the outer covering of the central nervous system" that protects the spinal vertebrae and cord. *Id.* at 527.

medical consultant, Beth Schaff, M.D., evaluated the medical record. She concluded that Matos retained the capacity to occasionally lift and carry twenty pounds, and frequently lift and carry ten pounds. She also noted that Matos could stand, walk, and sit for about six hours during an eight-hour workday. Dr. Schaff added that while Matos was limited to occasional overhead reaching, pushing, and/or pulling with his right arm, he could still (frequently) climb stairs, balance, stoop, kneel, crouch, and crawl, and (occasionally) climb ladders, ropes, and scaffolds. On February 12, 2007, Dr. Schaff's findings were endorsed by Richard Goulding, M.D., the chief medical consultant at MRC.

Approximately a year and a half later on March 31, 2008, Nurse Richard Russell evaluated Matos, and again at a follow-up visit on May 6, 2008. Nurse Russell completed a Psychiatric Review Technique Form in which he noted that Matos demonstrated symptoms indicative of an affective disorder. He opined that Matos might as a result suffer moderate difficulties in social functioning and in maintaining concentration, persistence, and pace. Nurse Russell added that Matos reported "severe" depression because of his inability to work. Nurse Russell concluded, however, that Matos' mental impairment was not severe.

## THE ALJ'S DECISION

The ALJ made the following written findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

2. The claimant has not engaged in substantial gainful activity since February 1, 2006, the alleged onset date.

3. The claimant has the following severe impairments: status post rotator cuff tear, diabetes mellitus, high blood pressure and lipoma.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that the claimant has a limited ability to push and/or pull with his upper extremities, he can occasionally climb ladders, ropes or scaffolds and he can occasionally crawl. He also has a limited ability to reach.

6. The claimant is unable to perform any past relevant work.

7. The claimant was born on March 13, 1960 and was 45 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

8. The claimant is not able to communicate in English, and is considered in the same way as an individual who is illiterate in English.

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11. The claimant has not been under a disability, as defined in the Social Security

Act, from February 1, 2006 through the date of this decision.

DISCUSSION

The decision of the Commissioner is conclusive so long as it is supported by substantial evidence and so long as the Commissioner has applied the correct legal standard. *See* 42 U.S.C. § 405(g); *Manso-Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996). "Substantial evidence . . . means evidence reasonably sufficient to support a conclusion. Sufficiency, of course, does not disappear merely by reason of contradictory evidence. . . . [The] question [is] not which side [the court] believe[s] is right, but whether [the Commissioner] had substantial evidentiary grounds for a reasonable decision . . . ." *Doyle v. Paul Revere Life Ins. Co.*, 144 F.3d 181, 184 (1st Cir. 1998). The Commissioner's findings "are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

Disability determinations follow a "sequential step analysis" mandated by 20 CFR § 404.1520. The analysis requires that the ALJ first determine whether or not a claimant was gainfully employed prior to the onset of the disabling condition. At the second step, the ALJ must determine whether a claimant suffers from a severe impairment limiting his ability to work. If the impairment is the same as, or equal in its effect to, an impairment (or combination of impairments) listed in Appendix 1 of the

regulations, the claimant is presumptively deemed disabled. If the impairment is not covered by Appendix 1, the fourth step of the analysis requires that the claimant prove that his disability is sufficiently serious to preclude a return to his former occupation. If he meets that burden, the Commissioner at the fifth step is obligated to prove that there are other jobs in the national economy that the claimant is able to perform. *Gonzalez Perez v. Sec'y of HEW*, 572 F.2d 886, 888 (1st Cir. 1978) ("[A] claimant must establish that he can no longer perform his prior vocation before the government is obligated to prove that alternative employment is available for a person in claimant's condition.").

The ALJ found at Step 1 and Step 2 that Matos had not been engaged in substantial gainful activity since February 1, 2006, and that he suffered four severe impairments: (1) status post rotator cuff tear; (2) diabetes mellitus; (3) high blood pressure; and (4) lipoma. Notably, depression was not listed. The ALJ determined at Step 3 that these impairments, although severe, nevertheless failed to rise to level of a listed impairment as defined in 20 CFR Part 404, Subpart P, Appendix 1. R. at 14. The ALJ then proceeded to Steps 4 and 5.

Steps 4 and 5 of the analysis necessarily require an assessment of a claimant's RFC. *See* 20 CFR. § 404.1545(a)(5). To evaluate the RFC, the ALJ must follow a two-step process to: (1) determine whether the claimant has an underlying medically

determinable physical or mental impairment that could reasonably be expected to produce the complained of pain or other symptoms; and (2) if such an impairment exists, to determine the extent to which it limits his ability to do basic work activities. This latter determination requires an evaluation of the intensity, persistence, and limiting effects of the claimant's pain or other symptoms. *See id.* § 404.1545(a)(2)-(3).

At Step 4, the ALJ determined that the impairments suffered by Matos could reasonably explain his alleged pain and other symptoms, but that Matos' complaints about the intensity, persistence, and the limiting effects of these symptoms were not consistent with his RFC assessment – and to that extent, not credible. The ALJ then proceeded to Step 5: the determination of whether – in light of Matos' RFC, age, education, and work experience – he retains the capacity to perform appropriate and available work in the national economy. The ALJ determined that Matos could perform jobs involving unskilled, light work that were available despite his illiteracy in the English language.

On appeal, Matos maintains that the ALJ's opinion was not supported by substantial evidence in three particulars: (1) the ALJ "ignored [Matos'] diagnosis of depression" in determining whether his impairments were severe; (2) he failed to support his finding that Matos' subjective complaints were not credible with specific facts; and (3) he improperly relied on the Medical-Vocational Guidelines in finding that

there are other jobs in the national economy that Matos could perform.

**The ALJ's Evaluation of Matos' Alleged Depression**

In his application for disability benefits, Matos claimed that he suffered from five impairments which precluded him from performing substantial gainful activity: (1) status post rotator cuff tear; (2) diabetes mellitus; (3) high blood pressure; (4) lipoma; and (5) depression. While the ALJ found the first four to be severe, he did not issue a specific finding as to Matos' claim of depression. Based on this omission – which the Commissioner does not contest – Matos argues that the ALJ completely "ignored [Matos'] diagnosis of depression . . . and the effects of [his] depression when contemplating his ability to work." Pl. Br. at 10.

The Commissioner, for his part, points to references in the ALJ's decision to Matos' mental health examination, mood, and affect, as well as Matos' testimony regarding his depression. These references, the Commissioner argues, indicate that "[Matos'] allegation of depression was considered by the ALJ *and* rejected as not severe." Def. Br. at 11 & n.5 (emphasis added). The fundamental point is that there is no "diagnosis" of depression (as Matos claims) by a qualified examiner in the record. The only medical evidence of Matos' mental state is the psychiatric review checklist completed by Nurse Russell. While noting Matos' complaints, Nurse Russell concluded that his condition was not "severe." By Matos' own account, the alleged

13

depression had endured less than six months; Matos presented no corroborating evidence suggesting that his mental condition was "expected to last for a continuous period of at least 12 months" so as to satisfy the durational requirement set out in 20 CFR §§ 404.1509, 416.909. In sum, while the ALJ might have more definitively addressed the issue, he did not ignore it: he (1) recited Matos' testimony regarding his alleged depression; (2) noted his mood and affect, both of which were found to be "appropriate"; and (3) cited the findings of Matos' mental health examination, which were likewise "unremarkable."

**The ALJ's Evaluation of the Credibility of Matos' Subjective Complaints**

Matos next contends that the ALJ erred when he dismissed as not credible Matos' subjective complaints of disabling pain, allegedly without adequately supporting his conclusion. Specifically, Matos takes issue with the ALJ's alleged failure to address "*any* of the Avery factors even though *all* the factors were required to be discussed." Pl. Br. at 14 (emphasis added).[19] Matos argues that without a full consideration of the *Avery* factors, the ALJ could not have properly "evaluate[d] the

---

[19] The *Avery* factors are as follows: (1) the nature, location, onset, duration, frequency, radiation and intensity of any pain; (2) precipitating and aggravating factors; (3) type, dosage, effectiveness and adverse side-effects of any pain medication; (4) treatment, other than medication, for relief of pain; (5) functional restrictions; and (6) the plaintiff's daily activities. *Avery v. Dep't of Health and Human Servs.*, 797 F.2d 19, 29 (1st Cir. 1986).

intensity, persistence, and limiting affects of [Matos'] symptoms to determine the extent to which the symptoms limit [his] ability to do basic work activities" as required by Social Security Ruling No. 96-7p. Pl. Br. at 13. The Commissioner disputes Matos' assertions that the ALJ must individually consider each of the *Avery* factors in order to comply with Ruling 96-7p, or that the ALJ failed to consider any of these factors. In this dispute, the Commissioner has the winning hand.

First, as a matter of law, the ALJ is not required to address all of the *Avery* factors in his decision. *N.L.R.B. v. Beverly Enters.-Mass., Inc.*, 174 F.3d 13, 26 (1st Cir. 1999). Rather, consistent with Ruling 96-7p, the ALJ's "determination or decision must *contain specific reasons* for the findings on credibility, supported by evidence in the case record, and must be *sufficiently specific* to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reason for that weight." Ruling 96-7p, Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, 1996 WL 374186, at *4 (SSA July 2, 1996) (emphases added).

Second, as a factual matter, the ALJ discussed many, if not all, of the relevant factors in his decision. He made specific citations to Matos' statements regarding his symptoms of pain: namely, (1) that Matos has continually experienced pain in the right arm and shoulder since his initial shoulder injury in 1992; (2) that he also has pain in

15

the left arm and neck resulting from the surgery to remove his lipoma; (3) that he has been depressed since his wife and father died in August of 2007; and (4) that he suffers from low energy and sleeping difficulties. The ALJ also noted Matos' claims regarding his functional limitations: (1) that he could sit for only one or two hours a day; (2) that he could only stand and/or walk for thirty minutes at a time, for a total of four hours; and (3) that he could lift and/or carry only ten to fifteen pounds with his left arm, and only five pounds with his right arm.

The ALJ then highlighted specific evidence in the record that supported his finding that Matos' complaints were not credible. The lipoma on Matos' upper back had been repaired, without any resultant limitations. While the rotator cuff problem persisted, there was no evidence of muscle atrophy. Moreover, Matos testified that the pain associated with the rotator cuff tear had dissipated as a result of his taking Ultram. The ALJ added that the findings of Matos' physical and mental status examinations were on the whole "unremarkable": (1) Matos' gait and station were normal; (2) his mood and affect were appropriate; and (3) there was no erythema or swelling of his shoulder. He also noted that Matos had been found able to stand, sit, and walk for a total of six hours over the course of an eight hour workday. Finally, he gave weight to

the professional judgment of the MRC medical consultants, who opined that Matos was able to perform light work.

**The ALJ's Use of the Medical-Vocational Guidelines**

Matos finally alleges that the ALJ's use of the Medical-Vocational Guidelines (Grids) at Step 5 in finding that he could perform other jobs in the national economy was improper. Specifically, Matos claims that the ALJ was required to elicit the testimony of a vocational expert to supplement or supplant the Grids, because Matos' non-exertional limitations – pain and the inability to read, write, or converse in English – "erode the occupational base and significantly impact his ability to do substantial gainful activity." Pl. Br. at 19.

While the First Circuit has cautioned against the mechanical application of the Grids where both exertional and non-exertional limitations are alleged, *Da Rosa v. Sec'y of HHS*, 803 F.2d 24, 26 (1st Cir. 1986), the Commissioner may rely on the Grids "if a claimant's nonexertional limitations do not impose significant restrictions on the range of work that the claimant is exertionally capable of performing." *Ortiz v. Sec'y of HHS*, 890 F.2d 520, 524 (1st Cir. 1989) (per curiam). In their relevant aspect, the court agrees with the Commissioner that Matos' claimed pain was not so severe so as to influence his ability to perform light work, even if his complaints were deemed credible. As the Commissioner contends, Matos' inability to read or write English is

immaterial under 20 CFR Pt. 404, Subpt. P, App. 2, §§201.00(i), 202.00(g), since Matos' ability to perform unskilled, sedentary, and light work does not depend on literacy. The Grid Rule on which the ALJ relied at Step 5 – Rule 202.16 – "specifically contemplates an inability to communicate in English." Def. Br. at 18.

## ORDER

For the foregoing reasons, the Commissioner's motion for an order of affirmance is <u>ALLOWED</u>. Matos' motion to reverse or remand is <u>DENIED</u>. The Clerk will enter judgment for the Commissioner and close the case.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE